# IN RE MACFARLAND.

CONSTITUTIONAL LAW; COURTS; LEGISLATIVE DELEGATION OF NONJUDICIAL
POWER TO JUDICIAL BODY; SUPREME COURT, DISTRICT OF COLUMBIA;
CORPORATIONS; JURISDICTION; WRIT OF PROHIBITION.

1. The duty attempted to be imposed upon the supreme court of this District by sec. 5 of the act of Congress of June 6, 1896, relating to the sale of gas in the District (29 Stat. at L. p. 251, chap. 335), of ascertaining the value of the plant of the Washington Gaslight Company, and cost of its future extensions and enlargements, as the basis for increasing its capital stock, is a legislative duty, involving the exercise of no judicial power, in the constitutional sense, and such requirement is therefore unconstitutional. (Mr. Justice Van Orsdel *dissenting*.)

2. The supreme court of this District is one of the inferior courts whose creation is authorized by sec. 1, art. 3, of the Constitution of the United States, and possesses the same powers and exercises the same jurisdiction as the circuit and district courts of the United States. (Citing sec. 61, D. C. Code, 31 Stat. at L. 1199, chap. 584, and *United States v. Baltimore & O. R. Co.* 26 App. D. C. 581.)

3. In those instances where special tribunals have been created by acts of Congress for the purpose of passing upon claims against the United States, from whose judgments, when final and conclusive, appeals will lie to the regular judicial tribunals, the judicial power is involved, for the controversy presents all the elements of a "case," in the constitutional sense. (Citing *United States ex rel. Bernardin v. Seymour*, 10 App. D. C. 294.)

4. The creation of corporations and the amendment of their charters, including the regulation of the amount of their capital stock, is a subject-matter exclusively within the legislative power, which power cannot be delegated, or devolved upon strictly judicial tribunals where the division of powers among the three departments of government provides for no such exception; although under a general act, complete in its details, certain functions relating to the final act of issuing the certificate of incorporation may be delegated to special agencies.

5. This court has no inherent superintending or supervisory power over the inferior courts of the District of Columbia, that will warrant the issue

of the writ of prohibition; but it has the power to issue such a writ in aid of its appellate jurisdiction. (Construing act of Congress of February 9, 1893, 31 Stat. at L. 1224–1227, chap. 1854, secs. 221–230, D. C. Code.)

6. This court having appellate jurisdiction, it is not necessary in a given case that an attempt shall have been made in such case to invoke that jurisdiction, before it can be said to attach in order to authorize the issue of a remedial writ, such as the writ of prohibition, in aid thereof.

7. The writ of prohibition will not issue in any case where there is another practical and adequate remedy. (Following *United States ex rel. Morris* v. *Scott*, 25 App. D. C. 88, and *United States ex rel. Holmead* v. *Barnard*, 29 App. D. C. 431.)

8. Where the supreme court of this District, entertaining jurisdiction in the premises, proceeded by one of its justices to act upon a petition of the Washington Gaslight Company for the ascertainment by that court of the value of its plant and cost of its future extensions and enlargements, as the basis for increasing its capital stock, as authorized by act of Congress of June 6, 1896, sec. 5 (29 Stat. at L. p. 251, chap. 335), after providing by regulation for the giving of notice by publication of such proceeding, and also for service of copies of the petition upon the United States Attorney General or Solicitor General and upon the District commissioners,—this Court, upon petition of the Commissioners, granted the writ of prohibition to such justice of that court and to the gaslight company, prohibiting further proceedings in that court, upon the grounds that the provision of the act in question was an unconstitutional delegation of nonjudicial power to a judicial tribunal, and that petitioners had no other practical or adequate remedy, there being no provision for an appeal by them. (Mr. Justice Van Orsdel *dissenting* upon the first ground stated.)

9. A final judgment on appeal carries with it all incidental questions that might have been considered and determined therewith, whether discussed or not in the opinion delivered.

No. 283. Original. Submitted January 7, 1908. Decided February 11, 1908.

HEARING on a petition by the commissioners of the District of Columbia for the writ of prohibition to a gaslight company and to one of the associate justices of the Supreme Court of the District of Columbia, to prohibit that court from proceeding to act upon a petition of the company for the ascertainment by the court of the value of its plant, etc., as the basis for the increase of its capital stock, as provided for by the act of Congress of June 6, 1896, sec. 5                    *Granted.*

The COURT in the opinion stated the facts as follows:

This petition was filed December 11, 1907, by the commis-
sioners of the District of Columbia, praying for a writ of pro-
hibition to issue to the Washington Gaslight Company and to
Mr. Justice Ashley M. Gould, of the supreme court of said
District, prohibiting the said justice from entertaining the
petition of the Washington Gaslight Company, presented under
the provisions of an act of Congress approved June 6, 1896,
for an ascertainment of the actual cash value of the plant, etc.,
as the basis for an increase of its capital stock.

A rule to show cause why the writ shall not issue was served
upon said company and said justice, to which they have made
returns.

From the petition and return the following facts appear:

The Washington Gaslight Company was incorporated by
special act of Congress on July 8, 1848, with an authorized
capital of $50,000. This stock has been increased from time
to time until it amounts to $2,600,000. On June 6, 1896, Con-
gress passed an act concerning the sale of gas in the District of
Columbia, the first four sections of which regulate the purity
of the gas and the price to be charged therefor.

Sec. 5 reads as follows:

"That neither the Washington Gaslight Company nor the
Georgetown Gaslight Company shall hereafter issue any greater
number of shares of stock than shall be equal to the actual cash
value of said plants and necessary cost of the construction of
future extensions or future enlargement of plants, which cash
value and cost of extensions shall first be ascertained and au-
thorized upon petition therefor to the supreme court of the
District of Columbia, under such regulations as the chief jus-
tice and the justices thereof shall prescribe; also, if either of
the said corporations shall desire hereafter to issue bonds upon
their property, secured by mortgage or otherwise, upon petition
therefor to said court, setting forth the necessity thereof and the
amount of stock issued and outstanding, it may and shall be law-
ful for said court, or the chief justice and justices thereof, as

the case may be, * * * to permit the issuance of such bonds and mortgage as desired: *Provided,* That the amount of stock and bonds issued shall not exceed the actual cash value of said plants and the cost of such extensions or enlargement of plants: *And provided further,* That the Washington Gaslight Company is hereby authorized to issue such additional amount of capital stock as will provide for the conversion into such stock of its outstanding certificates of indebtedness, which conversion of said certificates is hereby authorized to an amount not exceeding six hundred thousand dollars." [29 Stat. at L. 252, chap. 335.]

On June 10, 1907, the Georgetown Gaslight Company, the only other manufacturer of gas in the District of Columbia, filed its petition in the supreme court of the District, praying the ascertainment of the cash value of its plant and the necessary cost of construction of future extensions or enlargements of the same, under the provisions of said act.

Upon the presentation of this petition the supreme court of the District prescribed the following rules of procedure in such cases:

"Regulations prescribed by the chief justice and the associate justices of the supreme court of the District of Columbia for proceedings under sec. 5 of an act of Congress entitled 'An Act relating to the Sale of Gas in the District of Columbia,' approved June 6, 1896.

"1. Petitions under the act of Congress entitled 'An Act Relating to the Sale of Gas in the District of Columbia,' approved June 6, 1896, shall be filed on the equity side of the supreme court of the District of Columbia.

"2. Upon the filing of the said petition, one of the justices sitting on the equity side of the court shall fix a time for the initial hearing of the said petition; and thereupon the clerk of the court shall cause notice of the time and place of the said initial hearing and of the objects of the said petition to be published in two or more newspapers of general circulation in the District of Columbia once a week for three successive weeks prior to said hearing. He shall also cause a copy of the said

petition, together with notice of the time and place of the said hearing, to be served upon at least one of the commissioners of the District of Columbia and upon the Attorney General or Solicitor General of the United States, all or any of whom shall be entitled to appear at said initial or any subsequent hearing, and to be represented by counsel, and to present such evidence upon the matter of the said petition as to them or any of them shall deem proper. Any one or more stockholders in every company filing said petition shall also be entitled to be heard in person or by attorney.

"3. At such initial meeting such justice shall determine the manner in which testimony in support of or against the matter of said petition shall be taken. Said justice may refer the matter of said petition to the auditor of this court, or to a special master, to take said testimony and to report the same, with his findings thereon, to said equity court; or said justice may take the said testimony in open court, or may cause the same to be taken by an examiner in chancery.

"4. The final hearing of the said matter shall be had before any justice sitting upon the equity side of this court, after at least ten days' notice to the attorneys who may have appeared in the said case under the foregoing regulations.

"5. All proper costs and expenses (but not including counsel fees) incurred under these proceedings shall be paid by the petitioner, unless otherwise ordered by said justice."

November 5, 1907, the Washington Gaslight Company filed its petition under the act aforesaid, for the ascertainment of the actual cash value of its said plant and the cost of future extensions, or enlargement of the same. The day of hearing the petition was set for the 2d day of December, 1907, and notice was given by publication, as provided in the rules of procedure aforesaid, as well as to the Attorney General of the United States and the commissioners of the District of Columbia. The commissioners appeared by counsel and presented a motion to dismiss the petition on the following grounds:

(a) That the act of Congress entitled "An Act Relating to the Sale of Gas in the District of Columbia," approved June

6, 1896, under which said petition is filed, does not confer juris-diction on the supreme court of the District of Columbia to grant any of the relief prayed for in and by said petition.

(b) That the power proposed to be conferred on the supreme court of the District of Columbia in and by sec. 5 of said act is not judicial power within the meaning of art. 3, sec. 1, of the Constitution of the United States, and is therefore uncon-stitutional and cannot lawfully be exercised by the said supreme court of the District of Columbia.

(c) That said sec. 5 of the said act intended to confer power on said supreme court of the District of Columbia as a judicial function, and cannot therefore be construed as an authorization to the justices composing said court to exercise power thereunder in the character of commissioners or otherwise.

(d) That said sec. 5 of said act attemtps to impose a non-judicial function upon a court exercising the judicial power of the Constitution of the United States.

(f) That the proceeding in and by said petition is not a "case" within the meaning of art. 3, sec. 2, of the Constitution of the United States.

This motion was denied on December 7, 1907, and the court announced its intention to entertain the said petition and pro-ceed thereunder, and appointed a day on or before which answer should be made thereto. No further proceedings ap-pear to have been had, and the commissioners on December 11, 1907, filed this petition for a writ of prohibition. The Wash-ington Gaslight Company, in answer to the rule to show cause, avers the constitutionality of the act of Congress aforesaid, and the jurisdiction of the supreme court of the District of Colum-bia thereunder to entertain its said petition, and prays that the petition for the writ of prohibition be dismissed.

The formal return of Mr. Justice Gould admits the facts alleged in the petition, but denies the power of this court to issue the writ of prohibition, because it has no appellate juris-diction in the premises, and avers that if it has such jurisdic-tion the remedy of petitioners is by appeal. It also affirms the

constitutionality of the act of Congress and the jurisdiction of the supreme court of the District of Columbia thereunder.

*Mr. Edward H. Thomas,* Corporation Counsel, for the petitioners.

*Mr. R. Ross Perry, Mr. R. Ross Perry, Jr., Mr. R. H. Goldsborough, Mr. Wilton J. Lambert,* and *Mr. Edward McLean* for the respondent.

1. For nature and functions of the writ of prohibition, see Bl. Com. bk. 3, p. 112; *Warner* v. *Suckerman* (1615) 3 Bulst. 120; Shortt, Informations, Mandamus & Prohibitions, p. 427. The supreme court of the District of Columbia is the common-law court of original and general jurisdiction in that District. *Kendall* v. *United States,* 12 Pet. 524; *United States* v. *Schurz,* 102 U. S. 378, and it is the only tribunal in the District of Columbia having original jurisdiction to issue the prerogative writs. The court of appeals of the District of Columbia has no original jurisdiction. Its jurisdiction is appellate only. Sec. 220 and 226 D. C. Code. If appellate jurisdiction exists, the remedy is clearly by appeal, and not by prohibition. If, on the other hand, it does not exist, then the court of appeals cannot issue the writ of prohibition in aid of a nonexistent appellate jurisdiction. For the way the writs of mandamus and prohibition aid the appellate jurisdiction, see *Barbour Asphalt Paving Co.* v. *Morris,* 132 Fed. 945. Only those writs can be in aid of the appellate jurisdiction which compel lower courts to take such action as will aid, or refrain from taking such action as will hinder, the particular case from reaching appellate court. *Barbour Asphalt Paving Co.* v. *Morris, supra.* The issuing of the writ of prohibition, as prayed in the case at bar, would prevent that case from ever reaching this court, even supposing appellate jurisdiction to exist. It would not aid, but would, on the contrary, destroy, appellate jurisdiction. An appellate court cannot create a cause for the exercise of its appellate jurisdiction. *Barbour Asphalt Paving Co.* v. *Morris,*

*supra.* The appellate jurisdiction must exist in the particular case. *Ex parte Christy,* 3 How. 292. The prerogative writs cannot be used as writs of error. *Re Rice,* 155 U. S. 396; *Smith* v. *Whitney,* 116 U. S. 167. Prohibition will not issue when there is an adequate remedy by writ of error or appeal. *Re Huguley Mfg. Co.* 184 U. S. 297, 46 L. ed. 549 Sup. Ct. Rep. 455. That no appeal or writ of error is provided by law in the given case is immaterial. *Ex parte Christy,* 3 How. 292; *Ex parte Detroit River Ferry Co.* 104 U. S. 519; *Re Cooper,* 143 U. S. 495. Decisions of the supreme court of the United States in point are as follows: *United States* v. *Peters,* 3 Dall. 121; *Ex parte Crane,* 5 Pet. 190; *Ex parte Christy,* 3 How. 292; *Ex parte Gordon,* 1 Black, 503; *Ex parte Yerger,* 8 Wall. 97; *Ex parte Graham,* 10 Wall. 541; *Ex parte Warmouth,* 17 Wall. 64; *Ex parte Easton,* 95 U. S. 68; *Ex parte Gordon,* 104 U. S. 515; *Chesapeake & O. R. Co.* v. *White,* 111 U. S. 134; *Smith* v. *Whitney,* 116 U. S. 167; *Re Cooper,* 138 U. S. 404; *Re Fassett,* 142 U. S. 479; *Re Cooper,* 143 U. S. 472; *Re Rice,* 155 U. S. 396; *Re Massachusetts,* 197 U. S. 482; *Ex parte Glaser,* 198 U. S. 171; *Fields* v. *United States,* 205 U. S. 292; *Ex parte Wisner,* 203 U. S. 449. See also Taylor, Jurisdiction & Procedure of the U. S. Sup. Ct. p. 553, and an editorial note, which is really a complete treatise upon the subject, contained in Lawyers' Reports, Annotated, book 51, pp. 33 to 112, both inclusive. Precedents in this court are *Ex parte Dries,* 3 App. D. C. p. 165; *Deffer* v. *Kimball,* 7 App. D. C. 499; *Church* v. *Fidelity & Deposit Co.* 13 App. D. C. 264; *Sullivan* v. *District of Columbia,* 19 App. D. C. 210; *United States ex rel. Morris* v. *Scott,* 25 App. D. C. 88; *United States ex rel. Holmead* v. *Barnard,* 29 App. D. C. p. 431.

It would seem from the foregoing decisions that the court of appeals of the District of Columbia has explicitly decided:

First. That it is a court of appellate jurisdiction only.

Second. That it cannot issue the prerogative writs as original writs.

2. The act of Congress in question is constitutional. The constitutional assignment of all governmental functions to three different departments,—the legislative, the executive, and the judicial—is not absolute, exhaustive, or exclusive. Story, Const. secs. 518-554; Cooley, Const. Lim. p. 115; *United States* v. *Cooper,* 20 D. C. 104, S. C. 147 U. S. 272. The duty imposed upon the supreme court of the District of Columbia by the act in question is judicial in nature. *Chicago, M. & St. P. R. Co.* v. *Tompkins,* 176 U. S. 167. Courts have an inherent power over artificial persons or corporations, which they have not over natural persons. The legislature may, for proper cause, repeal the charter of a corporation; but it is equally true that the court, on the institution of a proper suit, may enforce the forfeiture of a charter. 2 Clark & M. Corp. secs. 303, 304, 312; 2 Cook, Corp. secs. 628 et seq. The act of Congress in question is in conformity with much similar legislation on the part of Congress. Instances of such legislation are the following:

(1) The act of Congress of June 10, 1896, "To Extend the Routes of the Eckington & Soldiers' Home Railway Company and of the Belt Railway Company, of the District of Columbia, and for Other Purposes," secs. 3 and 6. (2) The act of February 27, 1893, "To Amend the Charter of the Brightwood Railway Company of the District of Columbia," secs. 3 and 4. (3) The act of July 8, 1898, "To Incorporate the Washington & University Railroad Company of the District of Columbia," sec. 20. (4) The act of July 29, 1892, "To Incorporate the Washington & Great Falls Electric Railway Company," sec. 2. Under the terms of this act a petition was filed in the supreme court of the District of Columbia on May 28, 1895, No. 16,481. Equity. Upon consideration of this petition the court on the 29th day of May, 1895, ordered publication to be made, giving notice of the objects sought by the said petition, and on the 6th day of June, 1895, after the taking

of testimony, passed an order fixing the value of the actual and necessary cost of the construction and equipment of the said railway, and allowing the company to increase its capital stock to the sum of $650,000, and further allowing the company to retire 500 shares of the stock of the nominal value of $100 a share, and to issue coupon bonds in lieu thereof. This order will be found in Equity Minutes 42, at page 346. (5) The act of June 3, 1896, "To Amend an Act Entitled 'An Act to Incorporate the Washington & Great Falls Electric Railway Company.'" It is of importance to note that by this act of June 3, 1896, Congress expressly referred to and confirmed the stock and bond issue allowed by the decree of the supreme court of the District of Columbia passed in the equity cause above cited, and that within a few days thereafter (June 6, 1896) the act in question here was passed. It is therefore apparent that the legislation called in question here was not spasmodic or ill considered, but was a part of a determined and preconcerted plan, deliberately adopted and repeatedly followed by Congress.

Authorities and decisions confirming the judicial nature of the power hereby conferred, and of similar powers, are as follows: 1 Clark & M. Corp. pp. 115, 116; 10 Cyc. Law & Proc. p. 219; *Ex parte Chadwell,* 3 Baxt. 98; *Mayor* v. *Shelton,* 1 Head, 24; *Franklin Bridge Co.* v. *Wood,* 14 Ga. 80; *Grantry Co.* v. *Richards,* 95 Mo. 91; *Kayser* v. *Bremen,* 16 Mo. 91.

Instances of assignments to courts by legislatures of special judicial functions, will be found in *Re Canada Northern R. Co.* v. *International Bridge Co.* 7 Fed. 653. *McCrea* v. *Roberts,* 89 Md. 238; *Zanesville* v. *Zanesville Teleg. & Teleph. Co.* 64 Ohio St. 67, 52 L.R.A. 150; *State* v. *Circuit Court Judge,* 52 N. J. L. 585, 1 L.R.A. 86; *State* v. *Collins,* 19 Ark. 587; *Morton* v. *Woodford,* 99 Ky. 367; *Locke* v. *Speed,* 62 Mich. 408; *Somerset Co.* v. *Hunterdon Co.* 52 N. J. L. 512; *Re Mt. Morris,* 41 Hun, 29; *State* v. *George,* 22 Or. 142; *Kaufman Co.* v. *McGaughey,* 11 Tex. Civ. App. 551; *Edes* v. *Boardman,* 58 N. H. 580. Other decisions in point might be cited, but these are sufficient. Naturally, in the multiplicity of decisions in this

country, some may be found on the other side, but they are ill considered and have no inherent weight.

Decisions of the Supreme Court of the United States in point are as follows: *Ex parte Siebold,* 100 U. S. 371 (followed in *People* v. *Hoffman,* 116 Ill. 603; *Oregon* v. *George,* 22 Or. 158); *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447; *United States* v. *Duell,* 172 U. S. 576; *La Abra Silver Min. Co.* v. *United States,* 175 U. S. 423.

The foregoing cases would seem to be conclusive upon the constitutionality of the act of Congress in question here. Certainly, the duty imposed upon the court in the present case is more judicial than that imposed in any of the cases cited. See also *Nishimura Ekin* v. *United States,* 142 U. S. 651, 660; *Fong Yue Ting* v. *United States,* 149 U. S. 698; *Garrison* v. *New York,* 21 Wall. 196; *United States* v. *Jones,* 109 U. S. p. 513; *Frelinghuysen* v. *Key,* 110 U. S. 63; *Field* v. *Clark,* 143 U. S. 649. See also the following decision of this honorable court: *Chan Gun* v. *United States,* 9 App. D. C. 290. The proceeding in question is a cause within the meaning of the Constitution of the United States. Sec. 266, Taylor's Jurisdiction and Procedure of the United States Supreme Court. All *ex parte* proceedings are "cases" although the traditional *reus* is not always distinctly present. Of course, the Federal courts, having no municipal jurisdiction, do not afford many precedents of the commonest exercises of judicial power in such cases. But the local tribunals are full of such proceedings as the following, all of which are more or less *ex parte:* The adjudication of lunacy; the appointment of guardians to the young, aged and, in many jurisdictions, to habitual drunkards; the change of name of a private person; probate proceedings; many other instances might be mentioned. In the Federal courts the most conspicuous examples of *ex parte* proceedings are: The proceedings upon the application for all extraordinary writs; proceedings for naturalization; proceedings for extradition; proceedings for deportation; proceedings for patents; and others not necessary to enumerate. See *Ex parte Milligan,* 4 Wall. 2.

The power of Congress to legislate for the District of Columbia is derived from art. 1, sec. 8, par. 17, of the Constitution of the United States. It is undoubtedly true, as was decided in the case of *Roach* v. *Van Riswick,* MacArth. & M. 171, that Congress is not a local legislature in reference to this District, but it legislates for the District in its character as a national legislature, and therefore cannot delegate to a local legislative assemblage power to pass acts such as in the States would be the proper subject of State legislation. See also, to this effect, *Cohens* v. *Virginia,* 6 Wheat. 264. Congress may, by virtue of this provision of the Constitution, legislate over the District of Columbia as any State legislature over its subordinate municipalities. *Mattingly* v. *District of Columbia,* 97 U. S. 690. It can levy a direct tax on the District of Columbia by virtue of the article mentioned, even though the general language of the Constitution in regard to direct taxation is confined to the States. *Loughborough* v. *Blake,* 5 Wheat. 317.

It therefore follows that its power of appointing judicial officers in the District of Columbia, and the authority of those officers when appointed, are derived from art. 1, sec. 8, of the Constitution, and not from art. 3, sec. 1, which confers the general judicial power of the United States. See also, on this point, *Shoemaker* v. *United States,* 147 U. S. 298; *Callan* v. *Wilson,* 127 U. S. 540.

Objection has been made to the constitutionality of the act, in that the gas company, after the court has determined the actual cash value of the plant and necessary cost of the construction of future extensions or enlargements, is not compelled to issue stock for such amount. While this may be admitted to be true, it is equally true that the important point in the case, and the point determined, is the cash value of the plant and extensions. This is a judicial determination which is absolutely final and binding, and which cannot be avoided by the corporation. The nearest analogy to this act in the respect at present under consideration is furnished by condemnation proceedings. Both the courts of this District and the Supreme Court of the United States have repeatedly decided that the

constitutionality of condemnation acts is by no means impaired
by the fact that the judicial ascertainment of the value of the
lands to be taken imposes no binding duty on the sovereign, or
the person or body to whom the duty of deciding the propriety
of paying the amount is delegated, to take the lands at the as-
certained value.   See also secs. 486, 490 of the Code of Law
for the District of Columbia; *United States* v. *Jones,* 109 U.
S. 513; *Shoemaker* v. *United States,* 147 U. S. 282; *United
States* v. *Cooper,* 20 D. C. 104; *United States* v. *Gettysburg,
etc. R. Co.* 160 U. S. 668; *Bauman* v. *Ross,* 167 U. S. 548.
Perhaps as strong an analogy is to be found in the jurisdiction
of this honorable court in appeals from decisions of the Com-
missioner of Patents.


Mr. Chief Justice SHEPARD delivered the opinion of the
Court:

The case stated presents two important questions for deter-
mination.

The first of these involves the constitutionality of the act
of Congress invoked in the original petition of the Washington
Gaslight Company; that is to say, the power of Congress to
impose upon the supreme court of the District of Columbia the
duty of entertaining and acting upon that petition.

The second is whether this court, if it should be of the opin-
ion that the supreme court of the District is without jurisdic-
tion in the premises, has the power to issue the writ of prohibi-
tion prayed for.

1. After careful consideration, we are of the opinion that
the duty of ascertaining the value of the plant of the Washing-
ton Gaslight Company, and of its future extensions and en-
largements, as the basis for increasing its capital stock, is a
legislative one, involving the exercise of no judicial power in
the constitutional sense, and cannot, therefore, be imposed upon
the  supreme court of the District of Columbia.

In the language of Mr. Justice Miller, delivering the opin-

ion of the court in *Kilbourn* v. *Thompson,* 103 U. S. 168, 190, 26 L. ed. 377, 386:

"It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or National, are divided into the three grand departments, the executive, the legislative, and the judicial; that the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any of one these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall, by the law of its creation, be limited to the exercise of the powers, appropriate to its own department, and no other. To these general propositions there are in the Constitution of the United States some important exceptions." After enumerating these specific exceptions contained in the Constitution, which are in the nature of checks and balances of power, he proceeds to say: "In the main, however, that instrument, the model on which are constructed the fundamental laws of the States, has blocked out with singular precision and in bold lines, in its three primary articles, the allotment of power to the executive, the legislative, and the judicial departments of the government. It also remains true, as a general rule, that the powers confided by the Constitution to one of these departments cannot be exercised by another. It may be said that these are truisms which need no repetition here to give them force But while the experience of almost a century has in general shown a wise and commendable forbearance in each of these branches from encroachments upon the others, it is not to be denied that such attempts have been made, and it is believed, not always without success."

The supreme court of the District of Columbia is one of the inferior courts whose creation is authorized by sec. 1 of art. 3 of the Constitution, and possesses the same powers and exer-

cises the same jurisdiction as the circuit and district courts of the United States. Code, secs. 61 et seq. [31 Stat. at L. 1199, chap. 854] *Benson* v. *Hinkel*, 198 U. S. 1, 14, 49 L. ed. 919, 923, 25 Sup. Ct. Rep. 569; *United States* v. *Baltimore & O. R. Co.* 26 App. D. C. 581, 587. It is composed of six justices, who are empowered to hold special terms as circuit and district courts of the United States, as well as for other purposes made necessary by the exclusive jurisdiction of the United States over the territory comprised in the District of Columbia. It is to be observed that sec. 5 of the act under consideration authorizes the petition of the gas company for the ascertainment of the value of its plant and future extensions to be filed in said supreme court, the investigation to be had under such rules and regulations as the chief justice and associate justices thereof may prescribe; and upon the ascertainment of such values the corporation is authorized to issue additional stock and bonds not exceeding the value so ascertained. The power is conferred upon the court, and not upon any particular justice thereof as a special commissioner. The right, therefore to impose this power upon the court, as such, depends upon whether it is a judicial one. It is no sufficient answer to say that the question for ascertainment is judicial in its character because it involves the consideration of evidence and the exercise of discretion. In dealing with a question of this kind the supreme court of Connecticut has well said: "One controlling consideration in deciding whether a particular act oversteps the limits of judicial power is the necessary inconsistency of such acts with the independence of the judicial department, and the preservation of its sphere of action distinct from that of the legislative and executive departments. A main purpose of the division of powers between legislature and judicature is to prevent the same magistracy from exercising, in respect to the same subject, the functions of judge and legislator. This union of functions is a menace to civil liberty and is forbidden by the Constitution. There is no intrinsic difficulty in recognizing a plain infraction of such prohibition. It is true that the different magistracies must act upon the same subjects; for every matter that may be

dealt with by the State government may be acted on by each department thereof; but the action must be that belonging to the department whose powers are invoked. The main difficulties suggested in argument result from a failure to distinguish between the exercise of a legitimate power and the employment of necessary means for exercising that power. The grant of the powers embraced in one of the great departments of government carries with it the right to use means appropriate to the exercise of that power. Any attempt to cripple the power through metaphysical classification of the means essential to its exercise must produce difficulties, if not absurdities. For example: The power to make laws may require the accurate ascertainment of facts; for this purpose witnesses must be summoned, examined, and conclusions drawn from their conflicting testimony. This is a means peculiarly appropriate to the judicial power and the ordinary mark of an exercise of that power; yet when so employed by the legislature (without violation of other constitutional provisions) it is a means within the limits of legislative power. But should the legislature, after the passage of an act, attempt by another act to adjudicate the rights of parties which have arisen under its provisions, such act, although only means appropriate to legislation might be employed, would be an exercise of judicial, and not of legislative, power. It would be void because it involves the union, in the same magistracy, in respect to the same matter, of the functions of judge and legislator. Again, there are certain necessary executive acts which cannot be performed without the power of enforcing immediate obedience to an order authorized by law; the employment of legal restraint for the purpose of securing the essential immediate obedience is a means peculiarly appropriate to the exercise of judicial power; but for such purpose, and subject to the restrictions of other provisions of the Constitution, it is a means within the limits of the executive power. *Re Clark,* 65 Conn. 17, 28 L.R.A. 242, 31 Atl. 522; *Den ex dem. Murray* v. *Hoboken Land & Improv. Co.* 18 How. 272, 15 L. ed. 372. So, means of a legislative nature must be used by courts in establishing necessary rules of practice and by execu-

tive officers in making regulations for the conduct of subordi-
nates." *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 594,
39 L.R.A. 794, 37 Atl. 1080, 38 Atl. 708.   In that case the
statute authorized an appeal to the superior court from the ac-
tion of the city authorities in refusing to approve the applica-
tion of a street railway company for double tracking a portion
of its line; and it was held that the court had no jurisdiction be-
cause it was not the exercise of a judicial power.

It is true that, in some instances, special tribunals have been
created by Congress for the purpose of passing upon claims
against the United States, from whose judgments, when final
and conclusive, appeals will lie to the regular judicial tribunals.
But in such instances the judicial power is involved, for the con-
troversy presents all the elements of a case in the constitutional
sense.   *United States* v. *Coe,* 155 U. S. 76, 39 L. ed. 76, 15
Sup. Ct. Rep. 16; *United States ex rel. Bernardin* v. *Seymour,*
10 App. D. C. 294, 307; *United States* v. *Duell,* 172 U. S.
576, 583, 43 L. ed. 559, 562, 19 Sup. Ct. Rep. 286.   The last
cases cited affirm the right of appeal from the decisions of the
Commissioner of Patents in refusing a patent or in determining
the rights of adverse claimants to a patent in interference cases.
The Commissioner here acts in a judicial capacity, determining,
in a formal proceeding, the right between the public and the ap-
plicant in one instance, and between contesting claimants in the
other.    Exercising this special judicial power in such cases,
under the constitutional provision relating to patents, an ap-
peal may be given from his judgments to a court whose judg-
ment is final and must be executed.   But in so far as his ad-
ministration of his executive duties is concerned, there could be
no appeal to any authority save to that of his superior execu-
tive officer.   Instances of this kind furnish no precedent for
the case here presented.   One can hardly conceive of a case
where the duties required could be more aptly performed by a
judicial tribunal than in the examination of the facts and the
fixing of reasonable rates for common carriers, but such duties
clearly belong to the legislative department, and cannot be de-
volved upon the judiciary.   *Reagan* v. *Farmers' Loan & T. Co.*

154 U. S. 362, 397, 38 L. ed. 1014, 1023, 4 Inters. Com. Rep. 560, 14 Sup. Ct. Rep. 1047.

The only way in which the question can be determined by a court is when a suit is instituted by a carrier affected by a rate fixed by legislative authority, alleging that the same is unreasonable, in the sense that it is the destruction of property; and then the sole question is as to the reasonableness of the particular rate. There is no power to declare a reasonable rate for future observance.

The creation of corporations, and their amendment, embracing the regulation of the amount of their capital stock, is a subject-matter exclusively within the legislative power, and is a power that cannot be delegated, though under a general act, complete in its details, certain functions relating to the final act of issuing the certificate of incorporation may be delegated to special agencies. In some of the States where county and municipal courts are, under constitutional authority, local administrative bodies, vested with functions ordinarily vested in county commissioners, supervisors, and the like, they may be empowered to pass upon amendments to municipal charters affecting their territorial limits. But such powers cannot be devolved upon strictly judicial tribunals, where the division of powers among the three departments of government provides for no such exception. *People ex rel. Shumway* v. *Bennett,* 29 Mich. 451, 464, 18 Am. Rep. 107; *Galesburg* v. *Hawkinson,* 75 Ill. 152; *State ex rel. Luley* v. *Simons,* 32 Minn. 540, 542, 21 N. W. 750; *Re Ridgefield Park,* 54 N. J. L. 288, 291, 23 Atl. 674. See also *Re Cleveland,* 51 N. J. L. 311, 316, 17 Atl. 772.

Congress has unlimited power to amend the charter of the Washington Gaslight Company, increasing its capital stock at will. If it preferred, instead of making its own inquiry into the values of the property as a basis for action, to delegate that inquiry to the municipal officers of the District, it would have that power. Instead of delegating it to municipal officers, it has undertaken to convert one of the courts of the United States into such an agency. No judicial power is involved in the exe-

cution of the law.   The determination to be made does not involve an asserted and contested right, and when made is not a final and conclusive one that may be given effect to by the power of the court.   The petitioner is not bound to act upon the determination, nor is Congress bound by it.   Should the petitioner desire to act upon the determination, Congress would probably have to pass an act amending the charter to that end, or else provide for the amendment under a general law.   In pursuing either course, it may adopt the ascertained valuation, or change the amount of capital stock.   On the other hand, it might repeal the former act, and prescribe an entirely different rule.   Again, the proceeding authorized is *ex parte*.   No provision is made for opposing parties or a contest of the application.   It is true, the same court is authorized to make regulations for the procedure, but it is given no power to make the United States or the District of Columbia parties thereto.   Nor could such discretionary power be delegated; it must be exercised by the Congress itself.

The particular question, as presented here, has not been determined by any court, so far as we are advised, but we think that the governing principle is plain.   *Hayburn's Case,* 2 Dall. 409, 1 L. ed. 436; *United States* v. *Todd,* 13 How. 52 note, 14 L. ed. 47 note; *United States* v. *Ferreira,* 13 How. 40, 14 L. ed 42; *Gordon* v. *United States,* 117 U. S. 697 Appx.; *Re Sanborn,* 148 U. S. 223, 37 L. ed. 430, 13 Sup. Ct. Rep. 577; *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 485, 38 L. ed. 1047, 1060, 4 Inters. Com. Rep. 545, 14 Sup. Ct. Rep. 1125.

In *Hayburn's Case* the action of the majority of the circuit courts was upheld in refusing to execute an act of Congress requiring them to examine the evidence in support of claims preferred by soldiers of the Revolution to pensions granted to invalids by the act, and to determine the amount of pension that would be equivalent to the disability shown.   These pensions were to be certified to the Secretary of War, who was authorized to withhold the pension if he had cause to suspect imposition or mistake, and to report the case to the next session of Con-

gress. This act was amended immediately after the decision in *Hayburn's Case* by repealing the 2d, 3d, and 4th sections of the act of 1792, which gave rise to the questions stated in the note to that case, and provided another way of taking the testimony and deciding upon the validity of pensions granted by the former law, saving all rights to pensions which might be founded upon "any legal adjudications" under the act of 1792. Certain of the judges had acted under the act of 1792, holding that the intention of that act was not to require judicial action, but to designate the judges of the courts, by official, instead of personal, description, as commissioners, which positions they might accept or decline. In *Todd's Case,* brought to determine the validity of their action as such commissioners, by action to recover money paid in accordance with their action, it was held, as in *Hayburn's Case,* that the power sought to be conferred upon the circuit courts was not judicial power within the meaning of the Constitution, and could not, therefore, be exercised by them; and, further, that the act of Congress intended to confer the power as a judicial function, and could not be construed as authority to the judges to exercise the power out of court as commissioners. The result was a judgment for the recovery of the money.

In *United States* v. *Ferreira,* the act of Congress to carry into effect the provisions of the treaty whereby Florida had been acquired required the judges of the superior court of San Augustine and Pensacola districts to receive and adjust all claims arising under said treaty; their decisions to be reported to the Secretary of the Treasury, who, on being satisfied that the claims are just and equitable, should pay them. An appeal was taken by the district attorney of the United States, on their behalf, from one of such findings, which the Supreme Court dismissed for want of jurisdiction. Those territorial judges, and not the courts, were charged with the duty, which, it was held, was not a judical power. It was said:

"It is manifest that this power to decide upon the validity of these clams is not conferred on them as a judicial function to be exercised in the ordinary forms of a court of justice. For

there is to be no suit; no parties in the legal acceptance of the term are to be made; no process to issue; and no one is authorized to appear on behalf of the United States or to summon witnesses in the case. The proceeding is altogether *ex parte;* and all that the judge is required to do is to receive the claim when the party presents it, and to adjust it upon such evidence as he may have before him, or be able himself to obtain. But neither the evidence nor his award are to be filed in the court in which he presides, nor recorded there; but he is required to transmit both the decision and the evidence upon which he decided to the Secretary of the Treasury: and the claim is to be paid if the Secretary thinks it just and equitable, but not otherwise. It is to be a debt from the United States upon the decision of the Secretary, but not upon that of the judge. It is too evident for argument on the subject, that such a tribunal is not a judicial one, and that the act of Congress did not intend to make it one. The authority conferred on the respective judges was nothing more than that of a commissioner to adjust certain claims against the United States; and the office of judges, and their respective jurisdictions, are referred to in the law merely as a designation of the persons to whom the authority is confided and the territorial limits to which it extends. The decision is not the judgment of a court of justice. It is the award of a commissioner." Again, it was said: "The powers conferred by these acts of Congress upon the judge as well as the Secretary are, it is true, judicial in their nature. For judgment and discretion must be exercised by both of them. But it is nothing more than the power ordinarily given by law to a commissioner appointed to adjust claims to lands or money under a treaty, or special powers to inquire into or decide any other particular class of controversies in which the public or individuals may be concerned. A power of this description may constitutionally be conferred on a secretary as well as on a commissioner. But it is not judicial in either case, in the sense in which judicial power is granted by the Constitution to the courts of the United States."

The proceeding in the particular case was before a United

States district judge under the amendatory act of 1849, who
sat as a commissioner, and it was held that the act did not au-
thorize him to convert a proceeding before a commissioner into
a judicial one, and give an appeal from his decision to the Su-
preme Court.   As we have seen, the act under consderation,
like that passed upon in *Hayburn's* and *Todd's Cases*, did not
undertake to confer the power upon a justice of the supreme
court of the District as a special commissioner, but upon the
court as a judicial power.   The question, therefore, is not
whether one of the justices of the Supreme Court may be
charged, as a special commissioner, with the duty of making an
inquiry and finding in a special matter submitted to him, as
such, by Congress, but whether that duty can be imposed upon
one of the courts of the United States. . In *Interstate Commerce
Commission* v. *Brimson*, 154 U. S. 447, 38 L. ed. 1047, 4 Inters.
Com. Rep. 545, 14 Sup. Ct. Rep. 1125, the other cases, before
cited were reviewed and their doctrine affirmed.   In that case,
the question was whether the act of Congress authorizing the
Interstate Commerce Commission, a tribunal charged with the
power of inquiry into the reasonableness of the freight rates
of common carriers engaged in interstate commerce, to call
witnesses and require the production of books and papers, could
confer upon the courts of the United States, upon the complaint
of the Commission, the power to summon witnesses who had re-
fused to answer the questions propounded by that body, and
compel them to give evidence and produce papers, under the
penalty of contempt.   Agreeing that Congress could not impose
upon the courts any duties not strictly judicial, it was held
that the powers conferred by the act in question were of that
nature.   It was said that they presented all the elements of a
case, as declared in *Osborn* v. *Bank of United States,* 9 Wheat.
738, 819, 6 L. ed. 204, 223: "This clause enables the judicial
department to receive jurisdiction, to the full extent of the Con-
stitution, laws, and treaties of the United States, when any
question respecting them shall assume such a form that the
judicial power is capable of acting on it.   That power is capable
of acting only when the subject is submitted to it by a party

who asserts his rights in the form prescribed by law. It then becomes a case, and the Constitution declares that the judicial power shall extend to all cases arising under the Constitution, laws, and treaties of the United States." See also *Smith* v. *Adams*, 130 U. S. 173, 32 L. ed. 897, 9 Sup. Ct. Rep. 566, where it was said that the term "cases and controversies" in the Constitution embraced "the claims or contentions of litigants brought before the courts for adjudication by regular proceedings established for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs."

Applying these principles the court said: "The present proceeding is not merely ancillary and advisory. It is not, as in *Gordon's Case*, one in which the United States seeks from the circuit court of the United States an opinion that 'would remain a dead letter and without any operation upon the rights of the parties.' The proceeding is one for determining rights arising out of specified matters in dispute, that concern both the general public and the individual defendants. It is one in which a judgment may be rendered that will be conclusive upon the parties until reversed by this court. And that judgment may be enforced by the process of the circuit court. Is it not clear that there are here parties on each side of a dispute involving grave questions of legal rights, that their respective positions are defined by pleadings, and that the customary forms of judicial procedure have been pursued? The performance of the duty which, according to the contention of the government, rests upon the defendants, cannot be directly enforced except by judicial process. One of the functions of a court is to compel a party to perform a duty which the law requires at his hands. If it be adjudged that the defendants are, in law, obliged to do what they have refused to do, that determination will not be merely ancillary and advisory, but, in the words of *Sanborn's Case*, will be 'a final and indisputable basis of action,' as between the Commission and the defendants, and will furnish a precedent in all similar cases. It will be as much a judgment that may be carried into effect by judicial process as one for money, or the recovery of property, or a judgment in mandamus

commanding the performance of an act or duty which the law requires to be performed, or a judgment prohibiting the doing of something which the law will not sanction. It is none the less the judgment of a judicial tribunal dealing with questions judicial in their nature and presented in the customary forms of judicial proceedings, because its effect may be to aid an administrative or executive body in the performance of duties legally imposed upon it by Congress in execution of a power granted by the Constitution."

There is no substantial ground for the proposition that the power extended to the supreme court of the District of Columbia is a judicial one, in aid of the execution of a legislative act, as was the fact in *Brimson's Case.* Congress had ample power to amend the charter of the Gaslight company by increasing its capital stock and right to issue bonds, and to ascertain all the necessary or proper information leading to a just exercise of that power. If it preferred to have that inquiry made by some agency, it had the power to delegate it to the municipal officers of the District, or some other administrative agency. The act imposed no duty upon anyone, the performance of which, as in *Brimson's Case,* could only be obtained by resort to the judicial power. The act is an attempt to convert one of the courts into an administrative agency. No judicial power is invoked in the duty required by the act. As before stated, the determination is not a final and conclusive one that may be executed by the power of the court. It is not a judicial decree. Unlike that in *Brimson's Case,* the act makes no case for the exercise of judicial power. The proceeding is *ex parte.* No provision is made for a contest of petitioner's request. The benefit which it might obtain is not the creation of a property right, but a mere license. No duty is imposed upon or required of it. On behalf of the public interest, the act in *Brimson's Case* imposed a duty upon all persons to give evidence before a commission which had no power to enforce the attendance and obedience of witnesses, and could be invested with none. To make the act effective by guarding against a refusal to obey its provisions, a judicial proceeding was authorized in the form

of a regular case, in which there is a complainant and a defendant. The court was called upon, in a formal action, to determine a right as between the respective parties, under the law, and to render a regular and formal judgment declaring that right, which judgment was binding and conclusive, and within the usual power of the court to enforce. The proceeding presented all the essential elements of a case or controversy, in the constitutional sense,— a complaint and a complainant, a defendant and a judge to decide and enforce.

Nor is there any analogy between the question in this case and that determined in another case on which the respondent relies. *Canada Northern R. Co.* v. *International Bridge Co.* 7 Fed. 653. The act of Congress in that case authorized the construction and maintenance of a bridge across the Niagara river by the bridge company, and provided that all railway companies desiring to use the same should have equal rights and privileges in the passage of the same, and in the use of the machinery and fixtures thereof, and all the appurtenances thereto, under and upon such terms and conditions as shall be prescribed by the district court of the United States for the northern district of New York upon hearing the allegations and proofs of the parties, in case they shall not agree. The Canada Southern Railway, one of those authorized to use said bridge, filed its petition against the bridge company, in the said court, alleging that it had been unable to agree with the bridge company upon the compensation therefor, and praying an adjudication of the terms upon which it might use the said bridge. Holding that Congress had complete power to make the provision for the use of the bridge, it was further held that Congress had the power to devolve upon the court the duty of determining the disputed question in regard to the compensation for its use. Judge Wallace said: "The rights are created and established by the act; and this is the office of the legislative department. The power to adjudicate upon these rights, to ascertain, when controversy arises, their extent and value, and apply the appropriate remedy for their protection, is conferred upon the court; and this is the peculiar province of the judicial depart-

ment." Here we have a right, in the nature of property, creat-
ed by law, a deprivation of that right, a formal complaint
against the party denying it, filed in a court of competent juris-
diction, with power to determine the contested right and render
a judgment or decree conclusive of the controversy, that could
be enforced in the ordinary course of judicial proceeding.

We remark, in conclusion, that we fail to perceive any sub-
stantial difference between the statute under consideration in
this case, and one that would require the same court to hear evi-
dence relating to all the conditions of the business of the gas
company and, thereupon, to ascertain and declare its rate of
charges to consumers of gas in the District of Columbia. No
one pretends that this last power could be conferred upon the
court.

2. This brings us to the consideration of the second question:
Has this Court the power to issue the writ of prohibition prayed
for in this case?

Prohibition is one of the remedial prerogative writs of the
common law to prevent an inferior court from assuming juris-
diction of a matter beyond its legal cognizance. We think it
clear that the court of appeals cannot claim the possession of any
inherent superintending or supervisory power over the inferior
courts of the District of Columbia that would warrant the issue
of such a writ. Whatever jurisdiction it has must be found in
the act of its creation, approved February 9, 1893, and acts
supplemental thereto. Code, secs. 221 to 230 [31 Stat. at L.
1224–1227, chap. 854]. This last section confers the "power
to issue all necessary and proper remedial prerogative writs in
aid of its appellate jurisdiction." In accordance with this
view a writ of certiorari to the police court of the District was
denied, because, at that time, there was no appellate jurisdic-
tion over that court. *Ex parte Dries,* 3 App. D. C. 165, 167.

The Supreme Court of the United States has also refused to
issue a writ of prohibition to the supreme court of the District
of Columbia for the same reason. *Re Massachusetts,* 197 U.
S. 482, 49 L. ed. 845, 25 Sup. Ct. Rep. 512; see also, *Re Glas-
er,* 198 U. S. 171, 49 L. ed. 1000, 25 Sup. Ct. Rep. 653. How-

ever, sec. 7 of the act aforesaid (Code, sec. 226) confers the right of appeal to this court, at the instance of an aggrieved party, from any final order or decree of the supreme court of the District of Columbia, or any justice thereof; and, with some limitations, this right of appeal extends to interlocutory orders. Having this appellate jurisdiction, it is not necessary that an attempt shall have been to invoke that jurisdiction, before it can be said to attach in order to authorize the issue of a remedial writ in aid thereof. The decisions of the Supreme Court of the United States bearing on this question have been ably reviewed by the circuit court of appeals for the 8th circuit in the well-considered case of *Barber Asphalt Paving Co.* v. *Morris,* 67 L.R.A. 761, 66 C. C. A. 55, 132 Fed. 945.

The conclusion of that court, in which we concur, is thus stated:

"The reasons and decisions to which we have now adverted have impelled our minds with irresistible force to the conclusion that the true test of the appellate jurisdiction, in the exercise or in the aid of which the circuit court of appeals may issue the writ of mandamus, is the existence of that jurisdiction, and not its prior invocation; that it is the existence of a right to review by a challenge of the final decisions, or otherwise, of the cases or proceedings to which the applications for the writs relate, and not the prior exercise of that right by appeal or by writ of error." See also Taylor, Jurisdiction & Procedure of U. S. Sup. Ct. 548 et seq. It would be an unnecessay consumption of time to repeat the review of the cases supporting the doctrine that has been enounced.

A state of facts analogous to that in the case at bar is shown in one recently before the Supreme Court of the United States and decided since the submission of this case. *Re Metropolitan Railway Receivership* (*Re Reisenberg*) 208 U. S. 90, 52 L. ed. —, 28 Sup. Ct. Rep. 219. The opinion delivered embraced two original applications for leave to file petitions for mandamus, or in the alternative for a writ of prohibition, to one of the circuit judges of the second circuit and to the circuit court commanding the dismissal of a bill of complaint against certain

railroad companies, and all proceedings therein, and the vacation of injunctions and orders appointing receivers, as well as desisting from exercising any further jurisdiction over the said roads in said suit. The applicants for the writs were creditors of the railroad companies, and it appeared that they had applied for leave to intervene in said suit, alleging fraud and collusion between complainants and defendants therein to avoid the jurisdiction of the State courts and make a case cognizable in said circuit court. There applications for leave to intervene were denied; and from these orders no appeal could be prosecuted. The court assumed jurisdiction without discussing the question, and denied the applications on their merits.

3. It is the well-settled doctrine that the writ of prohibition will not issue in any case where there is another practical and adequate remedy. *Re Rice,* 155 U. S. 396, 403, 39 L. ed. 198, 201, 15 Sup. Ct. Rep. 149; *Alexander* v. *Crollott,* 199 U. S. 580, 50 L. ed. 317, 26 Sup. Ct. Rep. 161; *United States ex rel. Morris* v. *Scott,* 25 App. D. C. 88; *United States ex rel. Holmead* v. *Barnard,* 29 App. D. C. 431, 432.

There appears to be no other remedy whatever in this case. While the gas company might have the right of appeal from an order of the court below refusing the relief prayed, there is no corresponding right of appeal from an order granting that relief, for there is no adverse party against whom the order runs. Neither the district commissioners nor the Attorney General, to whom notice of the proposed hearing was given, presumably as representatives of the public interests, could appeal from the order, because they are not made by the act parties to the proceedings. Their situation is something like that of the applicants in *Re Metropolitan Railway Receivership, supra,* who had no appeal from the order refusing their intervention in a suit wherein they had an indirect interest only. Should the hearing contemplated in the court proceed to a final determination, the possible injury to the public interests, apprehended by the representatives thereof, could not be averted.

Notwithstanding the powers attempted to be conferred upon the supreme court of the District of Columbia are not judicial

in the constitutional sense, they are quasi-judicial in that they are conducted, in a measure, under judicial forms and rules leading to the announcement of an order thereon by a judicial officer. The exercise of the power we have held to be unlawful. Therefore, as its exercise might possibly result in injury for which there is no other adequate remedy, we will order the writ of prohibition to issue to prohibit further proceedings in the court below, as prayed. The costs of this proceeding will be adjudged against the Washington Gaslight Company, one of the respondents. It is so ordered.

Mr. Justice VAN ORSDEL, dissenting:

I am unable to concur in the opinion and judgment of the court in this case, and I believe that its importance warrants a statement of my views. The court has declared unconstitutional an act of Congress conferring upon the supreme court of the District of Columbia judicial authority to ascertain and decree the value of the plant and future extensions of the Washington Gaslight Company, which valuation, under the act, establishes a limitation beyond which the company may not go in the increase of its capital stock.

Before declaring a statute unconstitutional, courts should resolve every reasonable doubt in favor of its validity, and, if possible, so construe it as to carry into effect the legislative will. The Washington Gaslight Company is a public-service corporation. Its regulation is a matter of the highest concern. No narrow view should be taken in construing the power of Congress in enacting laws for its proper control and to restrain it from disregarding the public interests. The capitalization of this company is an important factor in fixing the price at which gas shall be sold to the public. Congress arbitrarily could have provided, as it did in respect to this corporation in the past, for the increase of the capital stock to a fixed amount. This policy, in respect to the operation of a corporation in which the public is so vitally interested, without any attempt to ascertain the actual value of its property, would afford little protection to the public, and might lead to grave abuse. Congress

could have conducted such an investigation itself, and accordingly provided for the issue of additional stock, or it could have delegated the duty of making this investigation to an officer or body of officers appointed by its authority. It is within the power of the legislative department of the government to impose upon the executive and judicial branches duties that, with equal propriety, might be performed by itself. It was not intended that the legislative, executive, and judiciary departments should be disconnected wholly from each other. Unless these departments be so far connected and blended as to give to each a constitutional control over the others, the degree of separation essential to a free government cannot, in practice, be maintained. Judge Story, in his Commentaries on the Constitution (vol. 1, sec. 525), speaking of the division and assignment of the powers of government into three different departments, the legislative, the executive, and the judicial, says: "It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. The true meaning is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free constitution."

The Constitution does not define or fix boundaries within which the three departments of the government shall exclusively operate. No such a narrow construction was contemplated by its framers. Only general limitations were fixed within which the powers of the several departments were prescribed. No exact and complete delimitation of the several departments has yet been defined by the courts, and it is doubtful if the problem will admit of a solution.

Thus it will be observed that Congress is given wide latitude in conferring special powers upon the co-ordinate branches of the government. If Congress, in the act in question, has legislated on those matters that exclusively belong to it, the execution of the law may properly be delegated away. It seems that the

first test to be applied is whether Congress has acted on all questions embraced in the act which belong exclusively to the legislative department. It is true that a court has no power to fix the amount of capital stock a corporation may issue, or to place a limit upon the increase of capital stock. These are matters exclusively within the power of the legislature. But that power has been exercised by Congress in the case at bar, and a distinct limitation has been fixed. It shall not exceed the value of the plant and the future extensions. This value, when ascertained, constitutes the limitation definitely fixed in the act. What has been imposed upon the court is to ascertain and adjudge by judicial determination the value of the plant and the future extensions.

That Congress could have conducted this investigation will not, I think, be disputed, but this fact does not prevent it from imposing the same duty upon the supreme court of the District of Columbia. In the case of *United States* v. *Duell,* 172 U. S. 576, 43 L. ed. 559, 19 Sup. Ct. Rep. 286, the court said: "Doubtless, as was said in *Den ex dem. Murray* v. *Hoboken Land & Improv. Co.* 18 How. 272, 284, 15 L. ed. 372, 377, Congress cannot bring under the judicial power a matter which, from its nature, is not a subject for judicial determination; but at the same time, as Mr. Justice Curtis, delivering the opinion of the court, further observed, 'there are matters involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.' The instances in which this has been done are numerous, and many of them are referred to in *Fong Yue Ting* v. *United States,* 149 U. S. 698, 714, 715, 728, 37 L. ed. 905, 913, 914, 918, 13 Sup. Ct. Rep. 1016."

Here all the rights are created and fixed by Congress, and the power to adjudicate and determine the extent of the right, when the company seeks to avail itself of the privilege granted by the act, is conferred upon the court. In the case of *Canada Northern R. Co.* v. *International Bridge Co.* 7 Fed. 653, power

was conferred upon a district court of the United States, in case of controversy, to determine and fix the compensation that should be paid for the use of a bridge. In the course of the opinion the court said: "The rights are created and established by the act; and this is the office of the legislative department. The power to adjudicate upon these rights, to ascertain, when controversy arises, their extent and value, and apply the appropriate remedy for their protection, is conferred upon the court; and this is the peculiar province of the judicial department. It is argued that the act attempts to confer upon the court the power to fix the rate of tolls which the International Bridge Company may charge, and that this is a legislative, and not a judicial, function. If Congress had fixed the rate of tolls, as it had the right to prescribe the conditions upon which the franchise might be enjoyed, no other authority could have intervened to change these conditions. But suppose the act had, in terms, provided that the bridge company might charge reasonable tolls, would not this have been a complete exercise of the legislative power, and would it not have remained for the judicial department to decide, when controversy should arise, what were or were not reasonable tolls? And if the act had provided for such a determination by a judicial tribunal, would this have been unconstitutional? It seems to me clearly not. It is no less the exercise of judicial functions to prescribe a rule of conduct or protect the existence of a right during a future period, than it is to determine whether the right has been invaded in the past. It is one of the common offices of a court or equity to do this."

The subject here submitted for judicial determination is the value of the plant and its future extensions. The finding of the court on this point is final and conclusive upon the company, and furnishes a maximum limit beyond which the company cannot go in the issue of its capital stock. The judgment, instead of being intended to compel the company to comply by issuing stock, is intended to restrain it within proper bounds if it chooses to exercise the right granted by the act. If the company refuses to accept and issue the stock, the same end is

accomplished by the judgment, only that it has had a still greater restraining effect than if its limitations had been accepted. The judgment is not only binding upon the company, but it is conclusive. There is no way in which the capital stock can be increased except by strict compliance with the terms of the decree. Congress no doubt considered that the failure of the company to accept the terms prescribed by the act could not in any manner prejudice the public interests. Hence, it will be observed that the finding of the court either restrains the company from taking any action whatever, or compels obedience to the court's decree. It is obvious that if the company should attempt to disobey the judgment of the court by issuing stock in excess of the value found by the court, the court would have jurisdiction to enforce a strict compliance with the terms of its decree.

In *United States* v. *Ferreira,* 13 How. 40, 14 L. ed. 42, cited in the opinion of the court, no decree was entered. The court simply forwarded the papers, with its findings therein, to the Secretary of the Treasury for final action. Hence, the court became a mere auditor for an executive officer of the government. The action of the court could be affirmed or disregarded by the Secretary of the Treasury, as he might deem proper. So, in *Hayburn's Case,* 2 Dall. 409, 1 L. ed. 436, and *United States* v. *Todd,* 13 How. 52, note, 14 L. ed. 47 note, cited by the court in its opinion, the finding of the court there was subject to review and nullification by the Secretary of War,—another executive officer. In the case of *Re Sanborn,* 148 U. S. 222, 226, 37 L. ed. 429, 431, 13 Sup. Ct. Rep. 577, the court said: "Such a finding is not made obligatory on the department to which it is reported,—certainly not so in terms,—and not so, as we think, by any necessary implication. We regard the function of the court of claims, in such a case, as ancillary and advisory only. The finding or conclusion reached by that court is not enforceable by any process of execution issuing from the court; nor is it made, by the statute, the final and indisputable basis of action either by the department or by Congress." This language will apply with equal force to the other cases cited in the opin-

ion of the court and relied upon to support its conclusions.
But that is not this case. Here, so long as the act stands upon
the statute books, there can be no review of a judgment entered
under its provisions outside of the judicial department of
the government. It stands as a part of the record of the
court, a binding judgment as to the value of the plant and
future extensions at the time it was entered, and a limitation
upon the powers of the company in increasing its capital stock.
As I have observed, it is not only a limitation, but binds the
company to the extent that it cannot increase its capital stock
in any other way, except by a strict compliance with the terms
of the decree. The proceedings are not advisory or ancillary.
No further action is necessary by Congress to authorize the is-
suance of the stock. All that is required is a strict compliance
by the company with the decree of the court, and the authority
to proceed under the statute is complete.

It is claimed that the act is defective in that it does not pro-
vide any method by which service may be made and a party de-
fendant brought into court. Conceding that Congress could not
confer upon the court the power to make a rule that would com-
pel a party to come in and defend, it is perfectly competent for
a court to make a rule by which general notice may be given,
and under which any party interested may come into court
and be heard. Notice by publication was provided for in the
rules promulgated in this case, and the right expressly reserved
for the stockholders to appear and protect their rights. It is
unnecessary for the admission of a party to an action, either
that the party shall have had notice, or that the court shall
have express power to compel such party to appear. The party
may appear voluntarily, and, if he appears to have a justiciable
interest in the subject of litigation, the court will permit him to
be heard. In most civil actions, it is optional with the defend-
ant whether he appears or not He may elect to permit judg-
ment to run against him by default. The summons or notice
is served on a defendant to an action to give the court jurisdic-
tion to enter and enforce its judgment either in favor of or
against the person so notified. Here the petitioner is the only

one against whom the court can enforce its judgment.   There is
no defendant who can be judicially affected by the decree.   It
is, by reason of this, no less a proper judicial proceeding.   In
many *ex parte* proceedings, the only party affected by the decree
entered therein is the petitioner, but usually general notice by
publication is given, affording an opportunity for any person
interested to appear and assert his rights.   The same right of
appearance in such a proceeding exists in the absence of notice,
—especially where the remedy sought runs in favor of or against
the petitioner, as in the case at bar, and as is generally true in
*ex parte* proceedings.   It may be suggested that the rule, in ad-
dition to providing for general notice by publication, requires
service to be made upon at least one of the commissioners of the
District of Columbia, and upon either the Attorney General
or Solicitor General of the United States.   In compliance with
such service, it was admitted at bar that the commissioners of
the District appeared and defended in the case of the George-
town Gaslight Company.   The same parties are here defending
on behalf of the public, as it is their duty to do, and as they
would doubtless do in proceedings of this kind in the future.
Their appearance, however, does not change the *ex parte* action
into a proceeding *inter partes*.   The decree entered can bind only
the company, and that is all that was intended by Congress.
It does demonstrate, however, that both Congress and the court,
by its rules, have provided fully for the protection of the pub-
lic interests.

But it is further suggested that, from the duty imposed upon
the court by the act of Congress, such a case cannot arise as calls
for the proper exercise of judicial power.   In the case of the
*Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447,
38 L. ed. 1047, 4 Inters. Com. Rep. 545, 14 Sup. Ct. Rep. 1125,
the court, considering the constitutionality of the 12th section
of the interstate commerce act, authorizing circuit courts of
the United States to use their process in aid of inquiries before
the Commission, said: "What is a case or controversy to which,
under the Constitution, the judicial power of the United States
extends?   Referring to the clause of that instrument which

extends the judicial power of the United States to all cases in law and equity arising under the Constitution, the laws of the United States, and treaties made or that shall be made under their authority, this court, speaking by Chief Justice Marshall, has said: 'This clause enables the judicial department to receive jurisdiction, to the full extent of the Constitution, laws, and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting on it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law. It then becomes a case, and the Constitution declares that the judicial power shall extend to all cases arising under the Constitution, laws, and treaties of the United States.' *Osborn* v. *Bank of United States,* 9 Wheat. 738, 819, 6 L. ed. 204, 223. And in *Den ex-dem. Murray* v. *Hoboken Land & Improv. Co.* 18 How. 272, 284, 15 L. ed. 372, 377, Mr. Justice Curtis, after observing that Congress cannot withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty, nor, on the other hand, bring under judicial power a matter which, from its nature, is not a subject for judicial determination, said: 'At the same time there are matters involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.' " In that case, Congress had created the Interstate Commerce Commission, and delegated certain powers to it for the regulation of public-service corporations engaged in interstate commerce. Here, Congress is legislating for the regulation of a public-service corporation. In both instances "there are matters involving public rights." The matters here presented are "in such form that the judicial power is capable of acting on them," and they "are susceptible of judicial determination." Congress, in bringing this matter within the cognizance of a court of competent jurisdiction,

instead of legislating directly upon the subject, certainly acted within the limits of the powers conferred upon it by the constitution.

Considering the plenary power reposed in Congress by the Constitution (art. 1, sec. 8, cl. 17) to legislate for the government of the District of Columbia, I am of the opinion that the power conferred by the act in question upon the supreme court of the District is a constitutional delegation of judicial authority.

On February 14, 1908, a writ of error to the Supreme Court of the United States was applied for by the respondents, and allowed.

On the same day the respondent, the Washington Gaslight Company, filed a motion in this court for an amendment of the opinion and judgment of the court.

The motion was denied, February 18, 1908, Mr. Chief Justice SHEPARD delivering the opinion of the Court:

This is a motion on behalf of the respondent, the Washington Gaslight Company, to have an amendment of the opinion and judgment in this case so as to show an express disposition of an exception and motion of the petitioners.

The record shows that the petitioners filed an exception to and motion to strike out so much of the respondent's return to the rule to show cause as refers to the proceedings had in the supreme court of the District of Columbia on the petition of the Georgetown Gaslight Company, because the same are no part of the record in the matter of the application of the Washington Gaslight Company. These were not called to the attention of the court for action, and passed without notice in the opinion, for that reason. The fact of the proceedings in the *Georgetown Gas Company Case* was incidentally before us in the argument.

It is argued that because no express disposition was made of the exception and motion, that fact may cause a writ of error from the Supreme Court of the United States, that has been applied for, to be dismissed, because a part of the case remains undisposed of. We think there is no substantial ground for

such apprehension. The case was disposed of on its merits, and the final judgment thereon carries with it all incidental questions that might have been considered and determined therewith, whether discussed or not in the opinion delivered. The exception and motion were not noticed because they were not called to the attention of the court, though filed and appearing in the record. They relate to a formal matter, apparently unimportant in the consideration of the merits of the case, and may well be regarded as having been waived by the failure of the petitioners to ask for their determination. This, we think, was the effect of the omission, and we see no occasion to reopen the case in order to make an express disposition of them now. This statement of the facts is made that the appellate court may be fully advised of the situation; and the motion is denied.